**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| CESAR LOPEZ and<br>MIRIAM LOPEZ,<br>individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WAKEFIELD & ASSOCIATES, LLC,<br><br>Defendant. | Civil Action No. ________________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Cesar Lopez and Miriam Lopez ("Plaintiffs") bring this Class Action Complaint on behalf of themselves and all others similarly situated against Defendant Wakefield & Associates, LLC ("Wakefield" or "Defendant"). Plaintiffs allege the following based on information and belief and the investigation of counsel, except for allegations specifically pertaining to them, which are based on personal knowledge:

**INTRODUCTION**

1. Plaintiffs bring this class action against Wakefield for failing to adequately secure and safeguard the sensitive personal information of Plaintiffs and similarly situated individuals ("Class Members"). The compromised data includes, among other things, names, Social Security numbers, driver's license or state identification numbers, and financial or collection-account information.[1]

---

[1] Notice of Data Privacy Event. https://wakeassoc.com/privacy-policy (last visited November 21, 2025).

2. Plaintiffs further bring this class action against Wakefield for failing to properly secure and safeguard Plaintiffs' and Class Members' personally identifiable information ("PII") and protected health information ("PHI") (together, "Private Information") Wakefield is a debt collection and revenue cycle management company that provides billing and collection services primarily to healthcare providers.

3. Plaintiffs and the Class Members are individuals whose Private Information was entrusted to Defendant. By collecting and maintaining this sensitive data, Defendant assumed—and owed—a duty to implement reasonable and adequate data security measures to secure, protect, and safeguard the Private Information against unauthorized access and disclosure.

4. Despite its duty to safeguard the Private Information of its current and former clients, Wakefield failed to do so. On or about January 14, 2025, an unauthorized actor infiltrated Wakefield's network and accessed sensitive data, resulting in the compromise of Plaintiffs' and Class Members' Private Information (the "Data Breach").[2]

5. The Data Breach occurred, in part, because Wakefield stored Plaintiffs' and Class Members' Private Information in an unencrypted and Internet-accessible environment.

6. After discovering the Data Breach in January 2025, Wakefield conducted an internal investigation and determined that "there was unauthorized access and/or acquisition of certain files within the network on or before January 17, 2025."[3]

7. Despite learning about the breach in January of 2025, Wakefield waited until November 7, 2025 to begin notifying impacted individuals of the unauthorized access.[4]

---

[2] *Data Breach Notifications*, Office of the Maine Attorney General. https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a8794077-a469-427d-887a-ed71e47efb9c.html (last visited November 21, 2025)
[3] FN1, *supra*.
[4] *Id.*

8. As a direct and proximate result of Defendant's failure to implement and adhere to basic data-security practices, Plaintiffs' and Class Members' Private Information has been exposed to cybercriminals.

9. As a direct consequence of the Data Breach, Plaintiffs and Class Members now face a significantly increased—and certainly impending—risk of fraud, identity theft, compromise of their health information, and other misuse of their Private Information, risks that may persist for life. As a result, Plaintiffs and Class Members must now expend substantial time, money, and effort to monitor their accounts and protect themselves, to the extent possible, from these ongoing threats.

10. Plaintiffs, on behalf of themselves and all others similarly situated, asserts claims for negligence, breach of implied contract, unjust enrichment, and declaratory judgment arising from the Data Breach. Plaintiffs seek monetary damages and injunctive relief requiring Wakefield to implement data-security practices reasonably sufficient to safeguard the Private Information in its custody and to prevent future breaches. Plaintiffs also seek lifetime identity-theft protection services for themselves and the Class Members.

**PARTIES**

11. Plaintiff Cesar Lopez is an adult who, at all relevant times, is a resident and citizen of the State of North Carolina. On November 7, 2025, he received a "Notice of Security Incident" from Wakefield informing him that the Private Information he had provided to the company was compromised in the Data Breach.

12. In or around July 2025, Mr. Lopez received a call from a local car dealership asking him to complete a vehicle-purchase transaction he had never attempted to initiate. The suspicious timing of this attempted fraudulent purchase, occurring shortly before Wakefield disclosed the Data Breach, further underscores the harm Mr. Lopez has suffered.

13. Plaintiff Miriam Lopez is an adult who, at all relevant times, is a resident and citizen of the State of North Carolina. On November 7, 2025, Ms. Lopez also received a "Notice of Security Incident" from Wakefield informing her that the Private Information she had provided to the company was compromised in the Data Breach.

14. Plaintiffs have suffered actual injuries as a result of the exposure and theft of their Private Information in the Data Breach, including: (a) the need to undertake mitigation efforts, such as researching the Data Breach and monitoring their financial accounts to guard against identity theft and fraud; (b) damages to, and diminution in the value of, their Private Information—an intangible asset that loses value when compromised; (c) loss of privacy; and (d) ongoing, imminent, and impending harm arising from the heightened risk of financial and medical identity theft and fraud.

15. As a direct and proximate result of the Data Breach, Plaintiffs have also experienced a significant surge in spam calls. Both Plaintiffs observed a marked increase in the volume of such calls compared to what they received prior to the Data Breach.

16. As a result of the Data Breach, Plaintiffs will continue to face a substantial and certainly impending risk of fraud and identity theft—and their attendant harms—for years to come.

17. Defendant Wakefield & Associates, LLC is a Colorado limited-liability company with its principal place of business at 830 E. Platte Ave, Unit A, Fort Morgan, Colorado 80701. Defendant's registered agent is LEGALINC Corporate Services Inc. located at 1155 Kelly Johnson Boulevard, Suite 111, Colorado Springs, CO, 80920.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class

are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

19. This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

20. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## FACTUAL ALLEGATIONS

21. Wakefield is a revenue cycle management and debt collection company that offers billing and collection services primarily for healthcare providers ("Defendant's Clients").

22. As a condition of doing business, Plaintiffs and the Class Members were required to provide their Private Information to Defendant's clients.

23. In the ordinary course of business, Defendant's clients were then required to provide the Private Information of their customers—including Plaintiffs and the Class Members—to Wakefield.

24. Plaintiffs and the Class Members value the confidentiality of their Private Information and have taken reasonable steps to maintain its privacy and security.

25. By providing their highly sensitive Private Information, Plaintiffs and the Class Members reasonably expected that Defendant would safeguard it with adequate and appropriate security measures.

26. By obtaining, collecting, and storing Plaintiffs' and Class Members' Private Information, Wakefield assumed legally and equitably enforceable duties to safeguard that highly sensitive data, to use it solely for legitimate business purposes, and to refrain from making any unauthorized disclosures.

27. Despite these duties, Wakefield failed to implement reasonable data-security measures to protect Plaintiffs' and Class Members' Private Information, thereby allowing threat actors to infiltrate its systems and exfiltrate that sensitive data.

***THE VALUE OF PRIVATE INFORMATION AND THE CONSEQUENCES OF ITS UNAUTHORIZED DISCLOSURE***

28. Wakefield knew that the Private Information it collected was highly sensitive and carried substantial value to criminals seeking to misuse it for wrongful purposes.

29. Wakefield also knew that a breach of its systems—and the resulting exposure of the Private Information stored on them—would substantially increase the risk of identity theft and fraud for the individuals whose data was compromised.

30. These risks are not theoretical; in recent years, countless major companies and institutions across industries have suffered significant data breaches, underscoring the real and pervasive threat posed when sensitive information is not adequately protected.

31. Private Information has substantial value and is a well-known, highly attractive target for cybercriminals. Stolen data can be readily sold or traded, fueled by the proliferation of anonymous Dark Web marketplaces that operate as active hubs for this illicit commerce.[5]

---

[5] *See* Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/

32. As the FTC recognizes, identity thieves can exploit compromised Private Information to commit a wide range of crimes, including identity theft as well as medical and financial fraud.[6]

33. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[7]

34. A 2022 survey of security executives predicted a significant rise in cyberattacks—particularly social-engineering and ransomware attacks—as both nation-state actors and criminal organizations become more sophisticated. The survey further noted that many of these attacks remain preventable and are most often rooted in basic failures such as system misconfigurations, human error, poor maintenance, and unmanaged or unknown network assets.[8]

35. The consequences of Wakefield's failure to safeguard Plaintiffs' and Class Members' Private Information are severe and long-lasting. Once stolen, Private Information can be misused for years. As the U.S. Government Accountability Office has explained: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that

---

[6] *See* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed November 21, 2025).

[7] *See Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last accessed November 21, 2025).

[8] *See* Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed November 21, 2025).

information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[9]

36. The absence of financial or payment-card data in a breach does not eliminate the harm or the substantial risk of identity theft. Freshly stolen Private Information can be weaponized in targeted schemes such as social-engineering and spear-phishing attacks. In these attacks, criminals use previously obtained PII—such as names, addresses, email addresses, and organizational affiliations—to build credibility and deceive victims into divulging additional sensitive information, enabling further fraud and identity theft.

37. The specific categories of Private Information compromised in the Data Breach are particularly valuable to cybercriminals and leave Plaintiffs and the Class Members especially vulnerable to identity theft, tax fraud, medical identity theft, credit and bank fraud, and other forms of misuse.

38. Given the high value of the Private Information in its possession, Wakefield knew or should have known the critical importance of safeguarding that data and the foreseeable harm that would result from a security failure. Nonetheless, Wakefield failed to implement adequate cybersecurity measures to prevent the Data Breach.

### *WAKEFIELD'S BREACH OF ITS DUTY TO PROTECT PATIENTS' PRIVATE INFORMATION*

39. In or around January of 2025, Wakefield became aware of a cybersecurity event.[10]

40. After learning of the Data Breach, Wakefield initiated an internal investigation, which determined that the unauthorized access occurred on or before January 17, 2025.[11]

---

[9] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf, (last accessed November 21, 2025).
[10] FN 1, *supra.*
[11] *Id.*

41. According to recent news reports, the threat actor accessed Wakefield's systems without authorization during the Data Breach and obtained certain personal information belonging to current and former patients of Wakefield's clients.[12]

42. On or around November 7, 2025, nearly ten months after the Data Breach began, Wakefield reported the Data Breach to various state agencies, including the Montana Department of Justice, indicating the Data Breach compromised the Private Information of 26,624 Montana residents.[13]

43. As set forth below, despite this threat, and other known threats, upon information and belief, Wakefield failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

44. On or around the time Wakefield notified the various state agencies of the Data Breach, Plaintiffs received a notice informing them that their Private Information had been compromised during the Data Breach.

45. Upon information and belief, Class Members received similar notices informing them that their Private Information was compromised during the Data Breach.

46. The Data Breach occurred as a direct result of Wakefield's failure to implement and follow basic security procedures to protect the Private Information that it had collected and stored.

***Wakefield's Noncompliance With FTC Data-Security Guidance***

47. The Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), prohibits entities from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal

[12] https://www.hipaajournal.com/wakefield-associates-data-breach/ (last visited November 21, 2025).

[13] https://dojmt.gov/office-of-consumer-protection/reported-data-breaches/ (last visited November 21, 2025).

Trade Commission ("FTC") has long recognized that failing to implement reasonable and appropriate data-security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the FTC Act.

48. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[14]

49. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [15]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

---

[14] *Start with Security–A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed November 21, 2025).

[15] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed November 21, 2025).

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

50. The FTC also advises companies to retain PII only for as long as necessary to complete the relevant transaction; to limit access to sensitive data; to require complex, secure passwords; to employ industry-tested security practices; to monitor networks for suspicious activity; and to ensure that third-party service providers maintain reasonable and appropriate data-security measures.

51. The FTC has repeatedly brought enforcement actions against companies that failed to adequately protect consumers' data, deeming the failure to implement reasonable and appropriate safeguards against unauthorized access an unfair act or practice under Section 5 of the FTC Act. The resulting consent orders further clarify the specific security measures businesses must adopt to satisfy their data-security obligations.

52. Here, Wakefield failed to properly implement basic data security practices. Wakefield's failure to employ reasonable and appropriate measures to protect against unauthorized

access to its Client's patients' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

53. Wakefield was at all times fully aware of its obligations to protect the PII of its Client's patients given the reams of PII that it had access to as Plaintiffs and the Class Members' provider. Wakefield was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

### *Wakefield's Failure to Prevent, Identify, and Timely Report The Data Breach*

54. Wakefield admits that an unauthorized third party gained access to its information technology systems.[16]

55. Wakefield failed to take necessary precautions or implement adequate safeguards to protect its systems from unauthorized access and to keep Plaintiffs' and Class Members' Private Information secure.

56. The Private Information that Wakefield allowed to be exposed in the Data Breach is the type of private information that Wakefield knew or should have known would be the target of cyberattacks.

57. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices, Wakefield failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.[17]

---

[16] FN1, *supra*.
[17] *See* Protecting Personal Information: A Guide for Business, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited November 21, 2025).

58. The FTC instructs businesses to employ intrusion-detection systems to identify breaches promptly, to continuously monitor network activity for attempted attacks, and to maintain an immediate response plan in the event of a breach. Timely notice to affected individuals is critical, as it enables them to take steps to protect themselves from resulting harm.

59. Here, Wakefield waited nearly ten months after the Data Breach occurred before notifying the individuals whose Private Information had been compromised.

***THE SIGNIFICANCE OF THE DATA BREACH'S EXPOSURE OF PROTECTED HEALTH INFORMATION***

60. Studies show that data breaches involving PHI carry especially severe risks; one study found that "the majority—approximately 70%—of data compromised in healthcare breaches can be leveraged by hackers to commit fraud or identity theft."[18]

61. Moreover, "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[19]

62. As explained by Jim Trainor, former second-in-command of the FBI's Cyber Division, "Medical records are a gold mine for criminals—they can access a patient's name, date of birth, Social Security number, insurance information, and even financial data all in one place. Credit cards might sell for five dollars, whereas PHI records can sell for $20 and up to $60 or $70."[20]

---

[18] *See* https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited November 21, 2025).
[19] *Id.*
[20] *See* IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-

63. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online . . . ."[21]

64. Cybercriminals routinely sell health information at a far higher premium than stand-alone PII because it enables far more extensive forms of fraud. With access to PHI, criminals can obtain medical treatment, purchase prescription drugs, submit false insurance claims, or even undergo procedures under a stolen identity. PHI also has a far longer "shelf life" than financial data; while consumers can quickly replace a compromised credit card, health-insurance information is far less likely to change. The financial consequences to victims can be severe—one study found that more than 65% of medical-identity-theft victims were forced to spend an average of $13,500 to resolve the resulting fraud.[22]

65. As noted above, the Data Breach compromised, among other things, highly sensitive health information. Accordingly, Plaintiffs and the Class Members must remain especially vigilant, given the heightened risks associated with the exposure and potential misuse of their PHI.

***WAKEFIELD FAILED TO COMPLY WITH HIPPA'S MANDATES***

66. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and

---

it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited November 21, 2025).

[21] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited November 19, 2025).

[22] Justin Klawans, What is medical identity theft and how can you avoid it?, The Week (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid.

Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

67. Wakefield is also subject to federal rules and regulations governing the safeguarding of electronic medical information under the Health Information Technology for Economic and Clinical Health Act ("HITECH"). See 42 U.S.C. § 17921; 45 C.F.R. § 160.103.

68. HIPPA's Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information, while HIPPA's Security Standards for the Protection of Electronic Protected Health Information establishes national security standards for health information that is stored or transmitted electronically.

69. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. Such health information includes "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

70. HIPPA's Security Rule requires entities such as Wakefield to, *inter alia*, do the following: (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

71. HIPAA also requires entities such as Wakefield to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally,

Wakefield is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

72. Moreover, both HIPPA and HITECH required Wakefield to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

73. Further, HIPPA requires an entity to provide notice of a data breach to affected individuals "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §§ 164.400-414.

74. Wakefield was, at all relevant times, aware of its obligations under HIPAA. Despite this knowledge, Wakefield failed to comply with those mandates and did not adequately protect the PHI of Plaintiffs and the Class Members.

75. Wakefield's failure is especially egregious because it was fully aware of both the volume and sensitivity of the PHI it collected and stored, as well as the foreseeable and severe consequences that would result from any unauthorized disclosure of that information.

***Damages Suffered By Plaintiffs And The Class Members***

76. The ramifications of Wakefield's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

77. Once Private Information is exposed, there is virtually no way to guarantee that it has been fully recovered or to prevent its future misuse. As a result, Plaintiffs and the Class Members must now maintain heightened vigilance for years—and potentially for the rest of their lives—because of Defendant's conduct. In addition, the value of their Private Information has been materially diminished by its unauthorized exposure in the Data Breach.

78. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[23] "Fullz" packages, which includes "extra information about the legitimate credit card owner in case" the scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[24]

79. Plaintiffs and the Class Members face a substantially increased risk of identity theft, fraud, and other misuse of their Private Information as a direct result of the Data Breach. Recent research shows that approximately 28% of individuals affected by a data breach become victims of identity fraud—a dramatic rise from a 2012 study showing a 9.5% victimization rate. By contrast, the likelihood of identity fraud absent a data breach is estimated at only about 3%.

80. Further, Plaintiffs and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

[23] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last accessed November 21, 2025).

[24] *Id.*

81. Beyond direct financial losses, victims of identity theft often must devote significant time and effort to resolving resulting issues. According to the FTC, consumers spend an average of approximately 200-hours over the course of six months to recover from identity theft.[25]

82. Plaintiffs and the Class Members also face ongoing risk because their Private Information remains stored on Wakefield's systems—systems that the Data Breach demonstrated are vulnerable to compromise. That risk persists so long as Wakefield fails to implement the necessary security controls and workforce training needed to adequately protect the Private Information in its possession.

83. Plaintiffs and the Class Members have suffered emotional distress as a result of the Data Breach, including the ongoing fear and anxiety associated with the increased risk of identity theft and financial fraud, and the knowledge that their Private Information has been exposed to unknown third parties.

84. As a result of Wakefield's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered—and will continue to suffer—numerous injuries, including out-of-pocket expenses; loss of time and productivity spent mitigating the consequences of the breach; theft and diminished value of their Private Information; imminent and ongoing risk of identity theft and fraud; and continued exposure of their data so long as Wakefield fails to implement adequate security measures.

---

[25] Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html (last accessed November 21, 2025).

## CLASS ALLEGATIONS

85. Plaintiffs bring this class action on behalf of themselves and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

86. Plaintiffs seek to represent a class of persons to be defined as follows:

> **All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class")**.

87. Excluded from the Class are Wakefield, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

88. This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

89. **Numerosity.** Plaintiffs are informed and believe, and thereon allege, that there are at minimum, tens of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes at least approximately 26,624 individuals from the state of Montana alone.

90. **Commonality.** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' Private Information, and breached its duties thereby;

c. Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

91. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and members of the Class each had their Private Information exposed and/or accessed by an unauthorized third party..

92. **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical as explained above.

93. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

94. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

95. **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

96. **Injunctive Relief.** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## COUNT I
## NEGLIGENCE
## (On Behalf of Plaintiffs and the Class)

97. Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

98. Defendant knowingly maintained the non-public Private Information of Plaintiffs and Class Members.

99. Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII and PHI it collected from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes,

among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in Wakefield's possession was adequately secured and protected

100. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

101. Defendant owed a duty of care to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

102. Defendant had a special relationship with Plaintiffs and Class Members. Plaintiffs and Class Members' willingness to entrust Wakefield's Clients with their Private Information to Defendant was predicated on the understanding that Defendant would take adequate security precautions to protect their PII and PHI.

103. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

104. Plaintiffs and members of the Class entrusted Defendant with their PII and PHI with the understanding that Wakefield would safeguard their information.

105. Defendant's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

106. Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

107. Defendant breached its common-law duty to exercise reasonable care in the collection and storage of its clients' patients' Private Information—a duty that exists independently of any contractual obligations. Defendant violated its common-law, statutory, and other duties owed to Plaintiffs and the Class Members in numerous respects, including by:

a. failing to adopt reasonable data-security measures, practices, and protocols;

b. failing to implement data-security systems, practices, and protocols adequate to protect Plaintiffs' and Class Members' PII and PHI;

c. retaining Plaintiffs' and Class Members' PII and PHI longer than reasonably necessary;

d. failing to comply with industry-standard data-security requirements; and

e. failing to timely disclose critical information regarding the nature and scope of the Data Breach.

108. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiffs' and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiffs and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

109. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

110. Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

111. Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

112. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

113. Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

114. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

115. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

116. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII and PHI is used; (ii) the publication and/or theft of their PII and PHI; (iii) out-of-pocket expenses associated

with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Wakefield fails to undertake appropriate and adequate measures to protect it; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

117. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

118. There is a direct and proximate causal connection between Defendant's failure to implement adequate security measures and the harm—and imminent risk of harm—suffered by Plaintiffs and the Class Members. Their Private Information was accessed and compromised precisely because Defendant failed to exercise reasonable care in safeguarding it, including by failing to adopt, implement, and maintain appropriate data-security measures.

119. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the

bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

120. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

121. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

122. Plaintiffs and the Class Members are therefore entitled to damages, including restitution and disgorgement of unjust enrichment, as well as declaratory and injunctive relief, together with attorneys' fees, costs, and expenses.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

123. Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

124. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as

Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

125. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI they obtained.

126. Plaintiffs and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

127. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

128. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

129. Furthermore, Defendant is Covered Entities under HIPAA, which sets minimum federal standards for privacy and security of PHI. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class members' electronic PHI.

130. Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d)

ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

131. HIPAA also requires Defendant to provide Plaintiffs and Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

132. Defendant violated HIPAA by disclosing Plaintiffs' and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI; and by failing to provide Plaintiffs and Class Members with notification of the Data Breach without unreasonable delay after its discovery.

133. Plaintiffs and the Class Members are customers within the class of persons HIPAA was intended to protect.

134. Moreover, the harm that has occurred is the type of harm that the HIPAA was intended to guard against.

135. Defendant's violation of HIPAA constitutes negligence *per se*.

136. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

137. Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

138. Defendant entered into contracts with Defendant's Clients, written or implied, to provide services. Upon information and belief, these contracts were identical between Defendant and Defendant's Clients, whose customers, including Plaintiffs and Class Members.

139. Pursuant to these contracts, Defendant received, among other things, Plaintiffs' and Class Members' Private Information from Defendant's Clients in exchange for their access to Defendant's services.

140. Upon information and belief, these contacts contained material terms requiring Defendant to use reasonable data security sufficient to safeguard Plaintiffs' and Class Members' Private Information.

141. Defendant knew that if it breached its contractual obligation to safeguard the Private Information with which it had been entrusted, Plaintiffs and Class Members would be harmed.

142. Defendant breached these contracts with Defendant's Clients by failing to use reasonable data security measures sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

143. As a direct and proximate result of Defendant's breaches of these contracts, Plaintiffs and Class Members have all suffered and will continue to suffer injuries as set forth herein and are entitled to damages sufficient to compensate for the losses they sustained as a direct result thereof.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

144. Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

145. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiffs and Class Members.

146. Plaintiffs and Class Members conferred a benefit on Defendant, by permitting Defendant's Clients to entrust Defendant with their Private Information.

147. The monies Defendant was paid by Defendant's Clients in the ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

148. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

149. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein before Defendant's Clients made their decisions to provide Defendant with their Private Information.

150. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

151. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Defendant was overpaid.

152. Under the principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

153. Plaintiffs and Class Members have no adequate remedy at law.

154. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

155. Plaintiffs and Class Members are entitled to full refunds, restitution, and damages, as well as an order requiring Defendant to disgorge all profits, benefits, and other compensation earned through its wrongful conduct. Such relief may be effectuated through the creation of a constructive trust for the benefit of Plaintiffs and the Class Members.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

156. Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

157. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

158. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether Wakefield is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that Wakefield's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

159. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Wakefield owes a legal duty to secure Private Information in its possession and to timely notify impacted individuals of a data breach under the common law, HIPPA, and various state statutes; and

b. Wakefield continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

160. This Court also should issue corresponding prospective injunctive relief requiring Wakefield to employ adequate security protocols consistent with law and industry standards to protect Private Information in Wakefield's data network.

161. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Wakefield. The risk of another such breach is real, immediate, and substantial. If another breach at Wakefield occurs, Plaintiffs will not

have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

162. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Wakefield if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Wakefield of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Wakefield has a pre-existing legal obligation to employ such measures.

163. Issuing the requested injunction would serve—not disserve—the public interest. It would help prevent future data breaches at Wakefield and protect Plaintiffs and other patients from additional harm stemming from further compromise of their confidential information.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Certification of the Class**.** Certifying this action as a class action; appointing Plaintiffs as Class Representatives; and appointing Plaintiffs' counsel as Class Counsel;

B. Injunctive Relief—Data Security Practices**.** Enjoining Wakefield from engaging in the wrongful conduct alleged herein regarding the misuse, mishandling, or disclosure of Plaintiffs' and Class Members' PII and PHI, and requiring Wakefield to issue prompt, complete, and accurate disclosures regarding any future data breaches;

C. Injunctive Relief—Data Security Policies**.** Requiring Wakefield to implement and maintain appropriate data-security policies, procedures, and technologies for the collection, storage, and protection of patient data, and to identify with specificity the categories of PII and PHI compromised in the Data Breach;

D. Restitution/Disgorgement**.** Ordering restitution and disgorgement of all revenues, profits, and other benefits unjustly retained as a result of Wakefield's wrongful conduct;

E. Credit Monitoring**.** Ordering Wakefield to provide not less than ten (10) years of credit monitoring and identity-theft protection services for Plaintiffs and Class Members;

F. Damages. Awarding actual, compensatory, statutory, and other damages and penalties as allowed by law;

G. Punitive Damages**.** Awarding punitive damages as permitted by law;

H. Attorneys' Fees and Costs**.** Awarding reasonable attorneys' fees, costs, and litigation expenses, including expert witness fees;

I. Interest. Awarding pre-judgment and post-judgment interest on all monetary awards; and

J. Further Relief. Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: November 21, 2025

Respectfully submitted,

/s/ Katherine M. Aizpuru
Katherine M. Aizpuru
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave. NW, Suite 1010
Washington, DC 20006
Telephone: (202) 973-0900
kaizpuru@tzlegal.com

Sabita J. Soneji*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
ssoneji@tzlegal.com

**Admission forthcoming*

*Attorneys for Plaintiffs and the Proposed Class*